[PHILADELPHIA, MAY 1ST, 1841.]

## GILDER *against* MERWIN and Others.

IN EQUITY.

The bill set forth that J. E. W. being in want of money, and Mrs. M., his mother-in-law being seized of certain real estate, he applied to the Philadelphia Savings Institution for a loan of money; and the complainant was induced, by motives of friendship, to take a conveyance of a certain part of her real estate for the purpose of immediately executing a mortgage of the same as a security for the loan : That the loan was accordingly made to J. E. W., who gave his notes to the Savings Institution for the amount, and the complainant executed his bond and a mortgage of the premises, and delivered the deed of the premises to Mrs. M., with a request to her to have it recorded : That when the notes of J. E. W. became due, they were renewed by the Savings Institution without the knowledge or consent of the complainant, and were a second time renewed in like manner; that J. E. W. became insolvent, and has since so remained : That a *scire facias* on the mortgage was issued by the Savings Institution; but the year not having expired, it was agreed between the counsel for the Savings Institution and the counsel for the complainant, that an action should be entered in the District Court for the City and County of Philadelphia, on the bond, and that judgment should be confessed; but the bill averred that the judgment was confessed without his (the complainant's) knowledge or consent, and that at the time of the confession of the judgment, both the complainant and his counsel, were ignorant that there was a defence arising from the renewal of the notes of J. E. W.: The bill further stated, that a sheriff's sale of the mortgaged premises had been attempted by virtue of an execution upon the said judgment; and that it was then discovered that the deed from Mrs. M. to the complainant had not been recorded : That he had applied to her for the deed, but she had refused to deliver it up, and had made defence to another *scire facias*, which had issued on the mortgage; and that the Savings Institution had applied to the District Court to set aside the levy on the mortgaged premises, with the declared intention of levying on the property of the complainant. The bill prayed a discovery from Mrs. M., the Savings Institution, their assignees, certain creditors who had issued attachments in execution against the complainant upon judgments against the complainant, &c.; an injunction against the Savings Institution and their assignees against proceeding upon the judgment against any other than the mortgaged premises, and against Mrs. M. against conveying or incumbering the mortgaged premises; and for general relief: *Held* that this court had not jurisdiction to grant the injunction or relief prayed for, either under the act of 16th June, 1836, or the act of 13th June, 1840.

THIS case came before the court on a motion to dissolve an

(Gilder v. Merwin.)

injunction which had been allowed on the 19th of December last, upon a bill filed by John Gilder against Mary Merwin and others.

The bill set forth—that sometime in the month of January, 1839, one Joseph E. West, of the state of New Jersey, was in the city of Philadelphia, and was then, as he represented to the complainant, somewhat embarrassed in his circumstances, but possessed of such sufficient means, that if he were relieved of his then difficulties, he would be able to discharge all his liabilities; which representation the complainant had since had full reason to believe the said West knew to be wholly false and untrue; but which he, having been on terms of friendship with, and then having a friendly opinion of him, did not at that time doubt. And that he was informed by West that his (West's) mother-in-law, Mary Merwin, one of the defendants, who was, and still is, a person of considerable property, was willing and desirous to aid him, the said West, in his difficulties, by advancing the sum of eleven thousand dollars out of her own property; and that she desired to see the complainant to consult with him upon the means of affording such relief.

That in conformity with such request and desire, he called upon Mrs. Merwin, who confirmed to him the representation of West, and communicated to him her intention to relieve West by encumbering her property for that purpose.

That by a certain deed, dated June 29, 1831, (and duly recorded in the city of Philadelphia,) after the marriage of the said Mary Merwin (who was theretofore for some time a widow, by the name of Mary Stewart) with her then husband, Samuel C. Merwin—they the said Samuel and Mary granted and conveyed all the real and personal estate and effects of the said Mary unto the same Joseph E. West, (the son-in-law of the said Mary,) his heirs, executors, administrators and assigns, in trust for the sole, separate and exclusive use of the said Mary during her natural life, to permit and suffer her, the said Mary, to occupy, let and demise the real property, and to call in, replace, change, transfer, invest and receive all moneys and securities assigned by the said deed, in any manner she might think proper; and to take, receive and enjoy the rents, issues, interest, dividends and profits of the same, free from the debts and control of her said husband, and to and for her own sole, separate and exclusive use and behoof, as if she were a feme sole. And by the said deed it was further provided, that it should be the duty of the said trustee, his heirs, executors, administrators and assigns, at any time thereafter, at the request of the said Mary, to be testified in writing, under her hand and seal, to sell and dispose of all or any part of the property thereby granted; and to grant and convey the same or any part thereof in fee simple to the purchaser and his heirs forever, free and discharged of and from any manner of trust or limitation whatever; and to receive and pay the money arising from

(Gilder *v.* Merwin.)

such sale to and for such uses as the said Mary Merwin in writing
should, from time to time, direct, limit and appoint. And it was fur-
ther provided, that on the death of the said Samuel C. Merwin,
during the life of the said Mary, the property granted by the said
deed, or such part as should remain unsold, should be conveyed by
the said trustee to the said Mary, her heirs and assigns forever.
And it was further provided by the said deed, that upon the· death
of the said trustee, or upon his being desirous to be discharged from
the said trust, it should be lawful for the said trustee, if he were
living, and the said Mary Merwin, or the survivor of them, to
appoint some other fit person to be trustee for the purpose aforesaid:
and upon such appointment, the trustee for the time being should
convey, transfer .and assign the said trust estate; and that the trustee
so appointed should thenceforth act as fully as if he had been origi-
nally appointed by the said deed.

The complainant further stated, that he was informed by the said
West, that he had poposed to the said Mary Merwin, and that she
had consented to and approved of, and he was also at or about the
same time informed by the said Mary Merwin herself, that she had
consented to and approved of a plan to relieve the said West of his
embarrassments; which plan was, that the said Mary should, in
conformity to the power reserved to her in the said deed of trust,
require by a certain paper writing under her hand· and seal, the said
West as trustee of the said Mary's real and personal estate and
effects, to sell and dispose of a certain house, No. 409 Chesnut street;
and that a deed therefor should be executed by West to such person
as should be willing to take the nominal and formal title to the same;
and that such person should thereupon execute a mortgage of the
said property for the sum of eleven thousand dollars in favour of any
one who should lend that sum to West: and that as an indemnity
or·counter security for the said Mary's liability, the said West should
execute his bond and warrant of attorney for the sum of $35,600,
conditioned for the payment of $17,800 to cover the said sum of
$11,000, and also the sum of $6,800, previously advanced to the
said West by the said Mary: which bond should be deposited in
the hands of the grantee of the said house, No. 409 Chesnut street,
in trust for the said Mary. And that the said West should discharge
himself of the said trust for the use of the said Mary, and should
convey and transfer all the remaining trust property to Charles S.
Boker, also one of the defendants, in trust for the said Mary Mer-
win.

That the complainant was then informed by the said Mary Mer-
win, that it was her wish and desire, and also the wish and desire of
West, that the complainant should agree and consent that the deed
so as aforesaid proposed, and also the bond of West, should be made
and executed in his favour for the purposes and· objects aforesaid.
And though he was unwilling to charge himself with the office, yet

(Gilder *v.* Merwin.)

having at that time no reason to doubt the representations of West as to the real sufficiency of West, and being repeatedly pressed and urged by him, and more particularly by the said Mary Merwin to undertake the office and business, and being assured by both that he should encounter no responsibility nor loss, and that it was only such a service as might be expected from his friendship and intimacy with the said Mary and West, and such as any prudent and disinterested man might render, he finally agreed and consented that the deed of the property might be made to him, and that he would execute a mortgage thereof, West always assuring him that the money would be paid before the mortgage would be due.

That on or about the 17th day of January, 1839, West succeeded in borrowing from the Philadelphia Savings Institution, a sum of money which he represented as $11,000, but which the complainant had since had reason to believe was not of so great amount, and which he believed was paid in post notes, issued and payable by the said institution, and for which he was to give, and did give, as the complainant was informed and believes, his promissory notes, payable in two or three months, or 60 or 90 days, in the sum of $11,000, to the said institution : and the complainant having at the same time executed the mortgage, was informed by the said institution, that it was expected his bond should accompany the said mortgage, as such was the usual course of business of the said institution; and that though he had not intended to do so, yet being pressed by the said West, and the transaction having gone so far, and the real estate mortgaged being, in the opinion of all parties, the principal security, and more than sufficient to pay the said debt of $11,000, he did execute his bond in the sum of $22,000, conditioned as was the said mortgage, for the payment of $11,000 in three months from the date thereof: and the complainant declared that throughout the whole transaction, the said Philadelphia Savings Institution knew fully and entirely that no part of the said sum of $11,000 was to go, and did go into his hands; that it was not in any way, shape, or degree, directly or indirectly for his benefit or advantage, but that he was a trustee for the advantage and benefit of the said West and Mary Merwin, and that he was not a security for the payment of the said debt, further than he might possibly become so upon the failure of the mortgaged property, to pay the whole debt; and that the said Institution lent the said money entirely upon the security contained in the mortgage.

The bill further stated that the said Mary Merwin executed her request to West, to convey and transfer the house, No. 409 Chesnut street, to the complainant, entirely and wholly without his persuasion, advice or opinion, and that he did nothing at any time to induce her to execute the same, and so far as he had any opinion at all, disapproved of it; but that the said Mary Merwin was then, and still is a person of middle age, living then as she had for some years previous,

(Gilder *v.* Merwin.)

separate from her husband, in the city of Philadelphia, as the head of her family; and her husband, then and for some time previous, living in the state of Alabama, where he practiced his profession as a physician, and that he is now dead, having died within the year; that the deed for the house, No. 409 Chesnut street, was then made and executed by West to the complainant; who, in pursuance of the original plan, then executed a mortgage thereof to the Philadelphia Savings Institution; and that at the same time West executed another deed, by which he conveyed all the rest of the real and personal estate of the said Mary, passing under the before mentioned deed of trust, to one Charles S. Boker, one of the defendants, upon the same trusts as he had theretofore held the same.

The complainant further declared that it was expressly understood between West and the Philadelphia Savings Institution, that the bond and mortgage executed by him were collateral securities, and guaranties for the payment of the notes then given, at the time of the delivery thereof to the Institution, by West, for the sum of $11,000, when the same should be due.

That West executed at the same time his bond and warrant of attorney, in favour of the complainant, for the security of the said Mary Merwin, in the penal sum of $35,600, conditioned for the payment of $17,800, of which sum $11,000 were her liability to the Philadelphia Savings Institution, and the balance, $6,800, former advances or loans made by her to West; and that the complainant at the same time executed a certain paper writing, wherein he declared that he held the deed of the said house, No. 409 Chesnut street, so conveyed to him, subject as aforesaid, to the said mortgage, and also the said bond of $35,600, in trust for the use and benefit of the said Mary; and that within a day or two after the transaction, he carried the declaration of trust, and the deed, to the house of the said Mary, and there delivered them both to her, informing her that the deed ought to be, and requesting her to have it recorded, which she at once and without hesitation promised to have done; and that he delivered the deed to her from no other motive than that of delicacy, considering it to be advisable in that respect, that she should be possessed of the same.

The bill further stated that of the sum of money procured from the Philadelphia Savings Institution, by West, at least the sum of $8000 were paid or transferred by West to Mrs. Merwin, who retained the same in her hands for the purpose, as she said, of discharging certain incumbrances then existing on certain real property of West, situated in the state of New Jersey, or for some other purpose, unknown to the complainant, and that the money was so retained by her for at least three months after the transaction; and whether it was ever paid out by the said Mary, or whether she had it still in her possession, the complainant did not know; and it was

some months after the said transaction that he discovered that so much of the money had actually gone into her possession.

The complainant further showed that West was soon after—about three months after the said transaction—and so has remained ever since, wholly insolvent, and that all his property has been or may be sold by the sheriff; and that the judgment bond is wholly worthless.

That when the notes given by West became due, he was unable to pay the same, and that the Philadelphia Savings Institution renewed them at an usurious discount, and deducted in the transaction an usurious interest, and paid such money as was paid in post-notes issued by and payable by the said institution. And that the last mentioned notes were also renewed under the same circumstances; and that the usury upon the same transactions amounted in the whole to the sum of $3000, or thereabouts; and that the first and all subsequent renewals of the same were made by the Philadelphia Savings Institution without the knowledge or consent of the complainant in any sense or degree, and without any consultation with him; and if the same had not been made, the said Mary or West might then have paid the same in whole or in part, and the complainant have been thereby discharged from his liability and interest in the transaction.

The bill further stated, that sometime in the month of September, 1839, the notes last given by West to the Philadelphia Savings Institution being due and unpaid, the said corporation sued out of the District Court of the City and County of Philadelphia, a certain writ of *scire facias* directed to the complainant, upon the said mortgage, and would have obtained judgment thereon, but that West insisted on behalf of the said Mary Merwin that an affidavit of defence should be put in by the complainant, and that if the complainant would not, he on behalf of the said Mary would put it in, alleging that the suit could not be sustained by reason that by the laws of this commonwealth no suit on a mortgage could be sustained until after the expiration of twelve months next ensuing the last day whereon the mortgage money ought to be paid: and that the counsel of the complainant communicated the threat and requirement of West to the counsel of the Philadelphia Savings Institution: and that the said counsel then agreed in writing that an amicable action should be entered on the said bond, and judgment therein rendered in favour of the plaintiff as on the 23d day of November, 1839, (within which time a summons in debt on said bond could have been issued and returned) for the sum alleged to be due, viz., the sum of　　 : and that the said judgment was so confessed at the request of the counsel of the Philadelphia Savings Institution, and with the assent of the complainant's counsel: and that the judgment was actually confessed and entered without his knowledge, participation or consent, in any manner and degree: and that he has never

SUPREME COURT [*March Term,*

ratified nor assented to the same, and that the mortgaged property was then and always has been actually sufficient to answer the debt and more; and that he had in equity under the circumstances a right to be exempted from execution on the judgment; as the mortgaged property must be first exhausted: and that such would have been a defence to an action brought against him on his bond. And that the Philadelphia Savings Institution always knew that the complainant was not interested directly nor indirectly to the amount of one cent in the money received by West; and that the mortgaged property was in fact the principal fund to recover the debt: and that at the time of the confession of the judgment and for a long time afterwards the complainant and his counsel were both ignorant, and without suspicion that there would have been or was any defence by the said Mary Merwin or by him, to an action for the recovery of the money, either on the bond or mortgage; such as thereinafter appeared.

The complainant further showed that, on the 16th day of November, 1839, being some days before the judgment was entered, and at the same term as that at which the judgment was entered, the District Court wherein the judgment was entered, made a rule in the words following: "Nov. 16th, 1839, Ordered that no judgment by confession shall be entered in any amicable suit, unless there be filed at the time of filing the agreement a specific statement of the cause of action signed by the parties or their attorneys; and where the said statement is signed by the attorney of the defendant there shall also be filed with the same his warrant of attorney. It being understood that this rule does not apply to judgments on warrant of attorney, nor to revivals of judgment by agreement." And that no authority was ever given by him to his counsel to sign any statement of the cause of action, nor any warrant of attorney ever given by him, nor any filed with the confession of judgment.

The bill then stated that the Philadelphia Savings Institution issued writs of *fieri facias* and *venditioni exponas* upon the judgment, and levied upon and exposed to sale the real property described in the mortgage. And that the same was put up for sale in the month of December, 1839, by the sheriff, and was knocked down to West for the sum of $         and that            was marked as second bidder at the sale, in the sum of $          ; and that Robert Bell and Wm. P. Lawrence were marked as third bidders for the sum of $         . And that West and the said           second bidder making default in payment, the property was offered to Bell and Lawrence, who agreed to take the same, and would have done so, as the complainant believed, but that it was discovered for the first time in making out the title for them, that the deed to the complainant from West was not recorded: and that they called upon the complainant for the same, and he having stated to them that he had delivered the deed to the said Mary Merwin, applied to

(Gilder v. Merwin.)

her to re-deliver to him the same, or at least to cause the same to be recorded, which she then and at all times afterwards refused; stating to him that she would do nothing to compromise her interests. And that afterwards, about the first of May, 1840, the counsel of the complainant wrote to her a note wherein he stated that the demand made upon her for the deed of the house, No. 409 Chesnut street, not having been complied with, he was instructed to institute suits against her for damages, and also to compel the delivery of the deed, unless she would cause the same to be recorded according to the terms in which it was placed in her hands: and that by a note dated May 9, 1840, the said Mary informed the counsel of the complainant that she had received his note, and that she " begged leave to refer him to Mr. Hirst, the counsel employed in this case, to whom she had inclosed his note." And that he has since always, by all means in his power, made representations to her of the inconvenience and embarrassments to which he was subjected, and by formal demands for the same, endeavoured to procure the deed, and wholly and entirely without success: and that he believes the same to be in her actual custody, possession and control: and that he is entitled in law and equity to have the same delivered to him. And he further stated, that before the sale of the said real property, he waited several times upon the said Mary, conceiving it to be his duty to keep her advised and aware of all his transactions in the business and of her condition, and informed her that the advertisements were out, and the property would be sold on the day named, and strenuously urged and advised her to go to New York, where West was then living, and to call upon and obtain from him the said sum of $11,000, as the only means of saving herself from such a loss: and that the said Mary being then, or believing herself, unable to go in her own person, sent on one Mr.      Miles to West, with instructions not to leave him until he had obtained from him the money: and that the said Miles returned to this city some time before the said sale, and brought with him, as complainant was informed, the necessary funds; and that at or about the same time West came on from New York, and at or about the time of sale, at which he was present, agreed with the said Bell and Lawrence, assignees of the Philadelphia Savings Institution, that he would pay them, and they agreed to take the sum of $11,000 in full satisfaction of all demands in virtue of the bond and mortgage: and that West then offered them post notes to that amount of the Tenth Ward Bank of New York, which was at that time a bank in credit, and they refused to take the same, and that the negotiation was broken off: and that the assignees treated with West, as the party principally interested in the business, and without any concert or consultation with the complainant.

The bill further stated, that some time in the month of September,

(Gilder *v.* Merwin.)

October or November, 1839, the Philadelphia Savings Institution being insolvent, made an assignment of the whole or part of the estate and effects of the said corporation to William Gill, Robert Bell and William P. Lawrence, in trust for certain purposes: and that the complainant was informed, and believed, that the bond and mortgage were included in the said assignment, &c.

That some time in the month of June, 1840, the Philadelphia Savings Institution sued out of the said District Court a certain writ of *scire facias,* to the use of the said Gill, Bell and Lawrence, upon the said mortgage, directed to the complainant and terre-tenants: that the complainant appeared thereto by his attorney, and that William L. Hirst marked his name generally for the defendants, but that he was not authorised in any way or manner to appear for the complainant; and that Mary Merwin, as terre-tenant, filed her affidavit of defence to the action, in which she stated. that there was a just and true defence to the action; and that she was informed and verily believed, that the title to the mortgage had never been legally vested in the plaintiffs who then sued, and that they had no right thereto; that no copy of any such assignment had been filed of record in the case; that the mortgage debt had been levied upon at the suit of several creditors by attachment of execution, issued out of the District Court, which attachments were pending, as the property of the Philadephia Savings Institution; that the mortgagor, at the date of the mortgage, had no title to the premises mortgaged, as she was advised and believed, (which representation the complainant declared to be false and unfounded;) that she claimed to own the premises mortgaged; and that she was informed and verily believed that the mortgage was given for the accommodation of one Joseph E. West as collateral security to the Philadelphia Savings Institution for their post notes, amounting to $11,000, issued to the said West; that such consideration was fraudulent and void; that all such post notes were not only a fraud upon the public, but a violation of the charter of the company; and that in the transaction the deponent was informed, and believed, that West was charged $3000 usury, the post notes having been renewed various times.

That after the filing of the affidavit, the plaintiff's counsel entered a rule on the defendants to plead in ten days, and that on or about November 10, 1840, (the complainant not pleading to the action at all, at any time,) the said William L. Hirst pleaded for the defendant "*non est factum* and payment," whereto the plaintiffs have since replied, and ordered the case to be set down for trial in December Term, 1840: and that since the said issue and order, the plaintiffs' counsel has informed the counsel of the complainant of the intention of the plaintiffs to proceed again on the judgment on the said bond, and to issue execution against the property of the complainant, and on the 17th of December, 1840, gave to the complainant's counsel written notice that he had obtained a rule to show cause why the

(Gilder v. Merwin.)

levy theretofore made under the judgment should not be set aside, returnable on Saturday, the 19th of December, 1840; and communicated to him that his instructions and intentions were to levy upon the furniture in the dwelling-house of the complainant.

The bill then stated, that certain persons, alleging themselves to be creditors of the Philadelphia Savings Institution, had issued writs of execution in the nature of attachments, against him, to levy upon the debt alleged to be due by him to the Philadelphia Savings Institution, or their assignees, and that in particular one George Miller, suing to the use of Henry Lentz, did sometime in January, A. D. 1840, sue out such writ; and on the 23d of November, the said William L. Hirst, as counsel for the plaintiff in that attachment, filed and gave to the complainant a copy of the interrogatory, asking whether he was not indebted to the said Philadelphia Savings Institution on a bond; to which the complainant had made answer, setting forth the circumstances under which he gave the bond, and denying his personal liability therein: and that the said Miller to the use of Lentz, threatened and intended to cause execution to be issued, to levy upon the complainant's alleged debt by bond to the corporation.

The complainant further stated, that he was never interested, directly or indirectly, to the amount of one farthing in the money lent by the corporation to West, and that no part thereof went into his hands; that the corporation lent the money wholly and exclusively on the security of the mortgaged property, and never had any reason to believe, and never did believe, that the complainant was liable, so long as the real estate was able and of sufficient value to cover the debt; that the real property is of more than sufficient value to pay the debt actually due, and interest; that the said Mary Merwin was and is a person of considerable property; that she insisted upon accommodating and advancing West, against the wishes and entreaties of all her family, (except Mrs. West,) being three daughters, of whom two were of full age, and that so far as the complainant expressed any opinion, in tendency it was to dissuade her from encumbering her property; that believing West then to be really solvent, though embarrassed, he had no reason, but a general idea of the inconvenience which, by any change in West's affairs, might be suffered by her; that she received from West, and had for a long time in her own hands, and may have now, for any thing known to the contrary, the sum of $8,000, the whole or part of the sum received from the corporation; that she was perfectly aware at the time of the transaction, of its effects and character; that she had already advanced $6,000 or $7,000 to West, and that West exhibited at that time to the complainant a statement of his means, showing himself to be worth considerably more than $100,000; and that it was discovered that the said Mary had neglected her promise, and the Philadelphia Savings Institution their

duty, to have the said deed recorded; that he had done all in his power to produce the deed, and all that can be done without the aid of this court.

The bill then prayed a discovery by Mrs. Merwin, the Philadelphia Savings Institution, their assignees Gill, Bell and Lawrence, C. S. Boker, George Miller, Henry Lentz and Peter Fritz, who was president of the corporation at the time of the loan; that the said Mary Merwin should deliver up the deed of the house, No. 409 Chesnut street, and that she and Boker should be restrained from conveying or encumbering the same; and that the Philadelphia Savings Institution and the said Gill, Bell and Lawrence should be restrained from proceeding on their judgment against any other than the property described in this mortgage; and that Miller and Lentz should be restrained from proceeding on their attachments, &c.

Separate answers were put in by the Philadelphia Savings Institution, by Messrs. Gill, Bell and Lawrence, the assignees, and by Peter Fritz.

The answer of the Philadelphia Savings Institution averred, that they knew nothing, and had not been informed, save by the complainant's bill, of any communications or conversations between the complainant and Joseph E. West and Mary Merwin, or either of them, or of any representations made by the said West or Merwin, or either of them, to the complainant, and could not form any belief concerning the same; but they had been informed, and believed it to be true, that Samuel C. Merwin, with the said Mary his wife, did, by deed dated the 29th day of January, A. D. 1831, convey all the real and personal estate of the said Mary to the said Joseph E. West in fee, upon the trusts and with the powers and provisions, or some of them, stated in the said bill; but for greater certainty, they refer to the same, &c. They stated, that the said Joseph E. West, on or about the 16th day of January, 1839, applied to them in writing for the loan of the sum of $11,000, the payment to be secured by his note, payable at ninety days, together with the bond and mortgage of John Gilder, Esq., (the complainant) upon the house and lot, No. 409 Chesnut street; which sum the defendants agreed to lend him, provided the security was found to be sufficient and satisfactory. The defendants having through their officers made inquiry into the value of the property, and the sufficiency of the title of the complainant to the premises proposed to be mortgaged, and being satisfied with the same, and with the personal responsibility and property of the complainant, agreed to make the loan of the said sum, payable in their certificates, which were then equivalent to cash, payable at their maturity. That on or about the 17th of January, 1839, the said Joseph E. West received from these defendants several certificates under the seal of the institution, signed by Peter Fritz, then

(Gilder *v.* Merwin.)

president, and N. P. Poor, then cashier, dated on the said 17th of January, 1839, certifying that he the said Joseph E. West, was entitled to the sum stated in each certificate (and which sums together amounted to $11,000) on deposit in the Philadelphia Savings Institution, to be paid to his order on the 27th of April, 1839, without grace: and on the same day, viz., on the 17th of January, 1839, the said West gave his promissory note to the defendants, bearing that date, at ninety days, for the said sum of $11,000, and delivered to them the bond of the complainant bearing the same date, in the penal sum of $22,000, conditioned for the payment of $11,000, in three months from the date, together with a mortgage executed by the complainant in the usual form, reciting the said bond, and mortgaging to the defendants " all that certain lot or piece of ground with the buildings and improvements thereon erected, situate on the north side of Chesnut street, between Delaware Twelfth and Thirteenth streets, in the city of Philadephia, containing in front or breadth on the said Chesnut street, twenty feet and a half, and in length or depth 150 feet to Clover street," &c., and reciting that it was " the same premises which Joseph E. West, of the state of New Jersey, gentleman, by indenture, bearing even date therewith, but executed immediately before that indenture of mortgage, and intended to be recorded, granted and conveyed unto John Gilder, (the complainant,) his heirs and assigns in fee."

The defendants expressly and absolutely denied that they informed the complainant after the execution of the mortgage, that it was expected his bond would accompany the mortgage or gave him any such information; and they denied that any mortgage executed by the complainant was produced or offered to them before the execution of the bond; but on the contrary, they expressly averred that the bond and mortgage of the complainant were produced to them together, according to the usual course of business; the said mortgage reciting as they have already stated that the bond had been executed by the complainant; and they had no knowledge or information of any wish or intention on the part of the complainant not to execute a bond or other personal obligation: and they averred that they would not have made the said loan if they had not expected to receive and had not received the said bond or personal obligation of the complainant.

They alleged that they knew nothing before or at the time of the said loan of $11,000, of its ultimate destination, nor into whose hands the money was to be paid by West, nor whether the complainant or Mrs. Merwin was to receive the same or any part thereof; nor had they since had any knowledge in respect to the same, except so far as is stated in the complainant's bill.

They denied that it was expressly understood between West and them, or in any way understood or agreed, that the bond and mortgage executed by the complainant were collateral securities or

guaranties for the payment of the note given by West, at the time of the execution thereof, or at any other time; but they averred that the said bond was received and taken by them as an absolute undertaking by the complainant for the repayment of the money lent, and that the said mortgage was received and taken by them as security for the payment of the said bond.

The answer further stated, that they knew nothing of the bond alleged in the bill to have been executed by West to the complainant, nor of any declaration of trust executed by the complainant, except so far as they were informed by the bill; and they had no knowledge of the circumstances stated in the bill respecting the delivery of the deed to Mrs. Merwin; but they were informed and believed that it appeared from an examination of the records in the office for recording deeds for the city and county of Philadelphia, that the deed recited in the mortgage to have been made by West to the complainant for the mortgaged premises had never been recorded; and they submitted that if the title to the premises be in any way affected by reason of the delivery of the said deed by the complainant to Mrs. Merwin, and the neglect of the complainant to have the same recorded, the complainant is answerable therefor to them.

They admitted that when the note given by West, on the 17th of January, 1839, fell due, he applied for a continuance of the loan, which they agreed to; and they paid at maturity, the amount of the certificates which had been issued in the name of West; and on or about the 20th of April, 1839, received from West his note at thirty days, bearing that date for the same sum of $11,000: and when the last mentioned note became due, West again applied for a continuance of the loan, which was also agreed to, and gave his note, dated the 23d of May, 1839, at forty-five days, for the same sum of $11,000; which note remained unpaid in the hands of the defendants: and they admitted that they did not consult the complainant with respect to the continuance of the loan; but they insisted that they were not bound to communicate with him or obtain his consent thereto, because they averred that the bond and mortgage of the complainant were given for the payment of the debt absolutely and without any reference to the notes given by West: and they believed that the complainant had full knowledge of the continuance of the loan, and of all the transactions between them and West.

They denied that the loan was made or continued at an usurious discount or usurious interest, and that the interest or discount received by them on the transaction amounted to $3,000, or any similar sum: and they submitted that if there was any thing of an usurious character in the contract between them and West, they were not bound to discover the same; and that by the rules of equity, a complainant cannot have relief in respect to any such alleged usury, unless he tenders or brings into court the money

actually lent, with lawful interest thereon; and further, that this complainant is not entitled to relief in this court from such alleged usury, or upon any other ground, after confessing judgment in the District Court, as admitted in his bill, and after the lapse of time that has taken place: and they prayed the same benefit of this defence as if they had demurred to this part of the complainant's bill.

They admitted that on the 27th day of September, 1839, the said loan remaining unpaid, they, through their counsel, sued out a *scire facias* upon the mortgage of the complainant, from the District Court for the City and County of Philadelphia, which was duly served and returned, as appears by the records of the court; and a copy of the mortgage was duly filed, for the purpose of obtaining judgment, according to the act of assembly; when the objection was taken that the year had not expired as required by law, and no further proceedings, as they were informed and believed, were had in that suit.

They admitted that on the 24th day of October, 1839, they executed to William Gill, Robert Bell and William P. Lawrence, an assignment of certain securities and other property and effects, including the bond and mortgage of the complainant, in trust for the benefit of the special and transient depositors in the institution; and that the said William Gill, Robert Bell, and William P. Lawrence, accepted the trust; and the said bond and mortgage were delivered to them for the purposes of the trust.

The answer then averred, that since the time of the said assignment the defendants had no concern in or control over the said bond and mortgage, and no knowledge of the transactions respecting the same that may have occurred since that time, excepting so far as they were informed by the said bill; and they were therefore not able to make answer relative to matters inquired of in the complainant's bill that may have occurred since the time of the said assignment.

They submitted that all the matters in the bill, were matters that may be tried and determined at law, and with respect to which the complainant was not entitled to relief in equity; and they prayed the same benefit of this defence as if they had demurred, &c.

This answer was signed by Robert Bell, President, and Wm. P. Lawrence, Secretary, and was sworn to by Peter Fritz, who swore that he was President of the Philadelphia Savings Institution, from February, 1838, to May, 1840.

The answer of Gill, Bell and Lawrence, the assignees, denied that they or either of them had any personal knowledge of the transactions mentioned or referred to in the complainant's bill as having occurred prior in time to the assignment to them, except that they had been informed and believe that the bond and mortgage of the complainant were taken at the time they bear date, by the Phila-

delphia Savings Institution, in the usual course of their business; the bond as an absolute engagement or obligation on the part of the complainant for the payment of the money therein mentioned, with the interest thereon, as therein stated, and the mortgage as security for the payment of the bond according to the terms thereof.

They admitted that on the 24th of October, 1839, an assignment was made to them by the Philadelphia Savings Institution of certain securities and other property and effects, including the bond and mortgage of the complainant, in trust for the benefit of the special and transient depositors in the said Institution, and that they accepted the trust and received from the Institution the bond and mortgage of the complainant for the purposes of the trust: and they averred, that they received the said bond, and took the same as a personal obligation and liability on the part of the complainant, and without any notice or knowledge of any of the circumstances stated in the bill, in respect to West and Merwin, to have occurred prior in time to the assignment, and without any notice or knowledge of any alleged or supposed defence either in law or equity on the part of the complainant to the payment of the bond or of any part thereof.

They admitted that they had been informed and believed that on or about the 23d of November, 1839, an agreement was entered into between their counsel and the counsel of the complainant for the entry in the District Court in the usual form, of an amicable action of debt upon the bond of the complainant; and that by the same writing it was agreed that judgment should be entered on the same day for the sum of $22,000, being the penalty of the bond; but whether the counsel for the complainant was specially or particularly authorised to enter into the agreement at or before the date thereof, they severally had and have no knowledge, except so far as is stated in the complainant's bill; and they submitted that the allegation in the bill, of the want of any such express or precedent authority, did not entitle the complainant to any relief in this court, inasmuch as they would have been entitled, in the regular course of the District Court, to a judgment on the bond on the 23d of November, 1839, without any agreement on the part of the complainant or his counsel, on filing a copy of the bond, which was done, as they were informed, &c.; and because the complainant had assented to and ratified the judgment at various times and in various ways, &c.

They admitted that their counsel obtained a writ of *fieri facias* upon the judgment from the said District Court, under which a levy was made upon the premises mentioned and described in the mortgage, and that the premises were condemned by the sheriff's jury, and a return made accordingly, and that after the return, a writ of *venditioni exponas* was obtained by their counsel from the District Court; under the authority of which the premises were advertised to be sold by the sheriff.

(Gilder v. Merwin.)

The defendants, Bell and Lawrence, answered, that a short time previous to the day on which the sheriff's sale was to take place, the complainant called at the office of the Savings Institution, as they understood him to say, for the purpose of settling the debt, and proposed that the assignees should waive their claim of interest and receive the principal amount of the debt. Being anxious to get possession of funds for the purpose of making payments to the depositors, many of whom were needy and clamorous, the defendant, Bell, after consulting with their counsel, in respect to the costs and expenses of the suit, told Mr. Gilder, the complainant, that if he would pay the sum of $11,250, the whole claim for interest and costs should be remitted. The complainant appeared to the defendant, Bell, to be perfectly satisfied with this proposal, and left him with the remark that it would be settled in a day or two, or words to that effect. The complainant called again at the office of the Institution, previous to the sheriff's sale, and informed the defendants, Bell and Lawrence, that he would give the assignees post notes of the Tenth Ward Bank of New York in payment of the debt; to which the defendant Bell, replied that he had never heard of such a bank; and requested the complainant to show the notes. The complainant said that he had not any of them with him, and that the defendants had better inquire about them. Inquiry was made by the defendant Bell, who was cautioned not to receive them. The complainant, as the defendants believed, remained in the office waiting the result of the inquiry; and on learning it, the complainant stated that West had the notes, and that he was to get them from him, (West.) The complainant did not, during the said conversation, speak of his being the agent or representative of West: and the defendants averred that it was afterwards stated in the newspapers that the notes with which the complainant offered to pay the debt had been fraudulently issued, and that West was one of the parties by whom the notes were issued, and the public were cautioned by advertisements in the newspapers against taking them.

The defendants denied that West ever called upon them in relation to the bond and mortgage, or ever made any offer to pay them in post-notes of the Tenth Ward Bank of New York, or in any other notes of that bank, or of any other bank or in any way whatever; and they also denied that they ever had any conversation with West on the subject of the debt or of the bond and mortgage.

The answer then stated, that they were advised that there was not and is not any such equity as that alleged in the bill, to require that the mortgaged premises should be exhausted before resort should be had to execution against the complainant's other property; but on the contrary they submitted that the bond is the principal or primary debt, and the mortgage security for the payment of the same, and that the courts of this state have uniformly refused to require the party holding a bond and mortgage to resort to the

(Gilder *v.* Merwin.)

mortgaged premises in the first instance.   And they insisted that if under ordinary circumstances they could be required to exhaust the mortgaged premises before proceeding upon the bond, yet as in consequence of the complainant having neglected to cause the deed to him to be recorded, and of his having improperly delivered the deed to Mrs. Merwin, difficulties and obstacles had been thrown in the way of obtaining satisfaction out of the mortgaged premises, the complainant was not entitled to the benefit of such alleged rule, nor to the interposition of a court of equity, or of any other court, to prevent the obligees on the bond from obtaining the fruits of their judgment.

They denied that they knew that the complainant was not interested directly or indirectly in the money received by West, or had any knowledge upon the subject of the original consideration of the bond and mortgage, at the time they were assigned to them.

They denied any knowledge of the rule alleged by the complainant to have been made by the District Court, save as they were informed by the bill, nor whether any express authority was given by the complainant to his counsel to sign any statement of the cause of action; but they were informed, and believed, that no application had been made by the complainant to the District Court to open or set aside the judgment; and they were advised and therefore insisted that the regularity and validity of the judgment were entirely within the province of the District Court, and that after the length of time that had elapsed, and the various proceedings that had been had upon the judgment, it was to be considered as ratified and confirmed by the complainant, if any such ratification and confirmation were necessary; and that neither the District Court nor this court if it had jurisdiction would now interfere.

They admitted that the mortgaged premises were exposed to public sale by the sheriff under the writ of *venditioni exponas,* and that they were knocked down to West for the price or sum of $11,750; and that one ———— Griswold was the second bidder; and the defendants, Bell and Lawrence, were the third bidders; that West and Griswold refused to comply with the terms of sale; and the defendants, Bell and Lawrence, averred, that they refused to take the property because it was then discovered that the deed to the complainant had not been recorded, owing to the negligence of the complainant and his improper delivery of the same to the said Mary Merwin.

The defendants, Bell and Lawrence, averred, that after the said sale they had several conversations with the complainant on the subject of the bond and judgment, and that the complainant, in those conversations frequently expressed a hope that the assignees would deal leniently with him, asserting that it was a hard case for him, or to that effect; to which they replied, that it was a harder case for the poor depositors whose money had been lent to the Institution

(Gilder *v.* Merwin.)

on the belief that they were secured by his and other bonds and mortgages, and who were now daily begging a few dollars to supply the necessaries 'of life ; and the complainant said in answer to this remark, that he was doing all he could to settle it. And the complainant did not in any conversation with either of them as they severally averred, allege or pretend, that the judgment on his bond was confessed without his knowledge and consent, or that he was not personally liable on the said bond ; but the defendants, Bell and Lawrence, averred, that in his conversation with them he merely asked for time and indulgence, and alleged as one reason for giving him time, that he expected to be able to arrest West in some proceeding that he stated· he intended to institute against him, and expected to be able to get from him money to meet the amount of the judgment against him, (the complainant.)

They admitted that their counsel sued out a writ of *scire facias* upon the mortgage against the complainant, with notice to the terre-tenants, to the term of June, 1840, of the District Court, in the name of the Philadelphia Savings Institution to their use, and that the complainant and the said Mary Merwin as terre-tenants had appeared by their respective attorneys, and that the said Mary Merwin filed an affidavit of defence in substance as stated in the complainant's bill; and that pleas had been entered as stated in the bill ; and that the attorney for the complainant had since entered a plea of *non est factum* for him.

The defendants, Bell and Lawrence, further averred, that their counsel obtained a rule from the District Court to show cause why an order should not be made upon Mrs. Merwin to produce on the trial of the *scire facias*, the deed for the mortgaged premises alleged in the complainant's bill to have been delivered by him to her, and that on the hearing of the rule she was examined in open court, and stated on her affirmation that she had never agreed with the complainant that the premises in question should be encumbered for the benefit of West ; that she had never to her knowledge executed any deed authorising the complainant to mortgage the premises ; and that she never had in her possession and never heard of any deed from West to the complainant, containing her authority or directions to convey the premises to her.

The defendants admitted that in consequence of the difficulties that had arisen in respect to the proceedings to obtain satisfaction out of the mortgaged premises, they had given instructions to their counsel to proceed upon the judgment against the complainant; and they had been informed and believed that their counsel did apply to the District Court and obtained a rule to show cause why the levy upon the mortgaged premises should not be set aside, and gave notice to the counsel for the complainant, and that on the return. of the rule, no opposition was made thereto by the counsel for the complainant, and that the rule was made absolute by the District Court.

(Gilder *v.* Merwin.)

They admitted that certain attachments in execution had been issued out of the District Court at the suit of certain alleged creditors of the Philadelphia Savings Institution, but inasmuch as the assignment to them was made before the issuing of any of the attachments, they were advised that the said attachments had no validity or effect upon the bond and mortgage of the complainant, &c.

The answer of Peter Fritz stated, that in the answer of the Philadelphia Savings Institution, was contained all his knowledge upon the matters inquired of in the bill; that he had no knowledge upon the said matters further than was stated in their answer; that he intended by their said answer, with his affidavit thereto, to be considered as answering for himself to the said bill as well as for the said institution; and he adopted the statements and averments in the said answer as his own, and prayed that they might be taken and received as his personal answer to the bill, as if he had joined in the answer at the time of making and filing the same.

The respondent further averred, that he had conversation with the complainant between the time of the renewal of the notes of West by the Philadelphia Savings Institution and the time of confessing judgment on the bond, viz., before the 23d of November, 1839; that the said conversations were on the subject of the notes of West, for which the complainant admitted his liability; and from his conversations with the respondent, he was satisfied that Gilder knew before the time of confessing judgment, all the circumstances in relation to the transaction between West and the Philadelphia Savings Institution, and especially the fact of the notes having been twice renewed. The respondent was satisfied that these conversations were previous to the 24th day of October, 1839, because on that day the assignment was made of the bond and mortgage to Messrs. Gill, Bell and Lawrence; and he (the respondent) took no part in relation to it after that day.

The motion now made was to dissolve the injunction so far as respected the Philadelphia Savings Institution and Messrs. Gill, Bell and Lawrence the assignees.

The case was argued by Mr. *T. I. Wharton* for the motion, and by Mr. *Hare* and Mr. *Williams* in support of the injunction.

The opinion of the court was delivered by

SERGEANT, J.—This case has involved the discussion of a great variety of topics, as well on the merits as on the equity practice, all of which, however, must necessarily be subordinate to the principal question, whether the court has jurisdiction? For the legislature have by no means conferred on us an universal, or even a general equity jurisdiction, as seems to have been conceived by some, and may be inferred from several instances of the same kind in which suitors have thought fit to apply to the equity jurisdiction of our

(Gilder *v.* Merwin.)

courts. On the contrary, equity jurisdiction has been dealt out to us at distant intervals and in limited portions, and we cannot usurp a jurisdiction not granted, nor exceed the limits within which the legislature has thought proper to prescribe it. It is true, it has become a task of some nicety to extricate from the great mass of equity jurisdiction exercised in other states and countries, that portion of it which has been conferred upon us: but it is our duty to encounter this task, and we would not be justified in enlarging our jurisdiction beyond the plain and obvious meaning of the legislature. If they had designed to bestow on this court, and the Court of Common Pleas, universal or even general jurisdiction in equity cases, however we might have thought it inconvenient and ill suited to the Supreme Court in its present organization, and likely to prove exceedingly oppressive and dangerous to the community, we should not have declined to exercise it. But it is clear they did not mean so to do, but intended to bestow a limited and selected portion of equity power, deemed to be suited to present exigencies.

Certain portions of equity jurisdiction are recognised in the constitution; and other portions, in regard to guardians, executors, administrators and intestates' estates, have long been exercised by the Orphans' Court, and by this court on appeal, during provincial times and since. About the year 1818, the legislature began to extend it to assignees and trustees; but the first extensive grant of this jurisdiction was by the act of 16th June, 1836, for the organization of courts, in one of the revised codes of the state, in which the powers of injunction, discovery, interpleader, supervision and control of corporations and partnerships and trusts, were given to this court and to the Common Pleas—to a much larger extent in the city and county of Philadelphia than in the commonwealth at large. Then came the act of 13th June, 1840, by one section of which the equity power is still further extended: and within one of these latter acts, the jurisdiction in cases like the present must be brought, if maintainable.

As a bill for an injunction, it seems to us that the present bill cannot be sustained: for the act of 16th June, 1836, sec. 13, confines the jurisdiction of this court in injunction cases, to the prevention or restraint of the commission or continuance of acts *contrary to law*, and prejudicial to the interests of the community or the rights of individuals. It cannot be seriously contended that the issuing execution on a judgment confessed in a court of law is an act contrary to law. Injunctions on equitable grounds are grantable by this court only where they are incidental to the relief prayed for, and where that relief is within our jurisdiction by the acts of assembly.

Nor is it maintainable as a bill for discovery merely; for by the same act, sec. 13, that jurisdiction is extended only to the discovery of facts material to a just determination of issues and other questions arising or depending in this court or the Court of Common

Pleas of this county; whereas the judgment was confessed in the District Court; and that court has, by the same section, jurisdiction in cases of discovery fully adequate to the purpose of suits pending there.

As a bill for relief, if maintainable at all, it must be under the provisions of the 39th section of the act of 13th June, 1840, which enacts that " the equity jurisdiction of the Supreme Court within the city and county of Philadelphia, and of the Court of Common Pleas for the said county, shall be extended to all cases, over which courts of chancery entertain jurisdiction on the grounds of fraud, accident, mistake or account." The word *fraud,* here, seems to contemplate only actual fraud, and not the extensive heads of equity jurisdiction, which are termed constructive fraud, or bills for prevention of fraud, embracing injunctions, bills for partition and dower, bills to marshal assets, bills of discovery, of interpleader, &c.; and various others of which Maddock in the 1st volume of his treatise on Chancery Jurisdiction, enumerates sixteen heads, each of great compass and extent, many of which are provided for by special acts of assembly, and in others the jurisdiction has been long exercised by the orphans' and other courts. There is no fraud alleged in this bill against any of the defendants except Mrs. Merwin. West has not been served with a subpœna, being, as the plaintiff alleges, out of the jurisdiction of the court. If the case falls within the act at all, it would seem to come rather within the jurisdiction in case of accident or mistake. One ground relied on for relief is, that the plaintiff, after the confession of a judgment on his bond, in favour of the Savings Institution, discovered facts and evidence of which he was ignorant at the time of the confession, which would have been an available defence for him, in case he had made a defence to the suit on the bond, and gone to trial on the merits; namely, that the Savings Institution had given time to West by taking renewals of his notes; whereby the plaintiff, who was only a surety, was discharged. This ground of newly discovered facts, is called a bill for a new trial.

These heads of fraud, accident, mistake and account are the heads with which our ordinary treatises on equity jurisdiction begin, and they are those which Mr. Justice Story in his very able Commentaries on Equity, vol. 1, 85, 86, considers as peculiarly appropriate to a chancery jurisdiction, and standing most in need of the peculiar powers of such a court; and that when we depart from them as the foundations of the bill, it becomes more difficult to define its jurisdiction. It is possible this may have had its operation in inducing the legislature to add by this section to its former grants of equity jurisdiction to this extent and no further. Certain it is, that if under these words we should carry out our jurisdiction to the extensive regions to which I have referred, it would be extremely unsuited to a court which, besides its other pressing employment in errors and appeals, as well as original process, has a vacation here of eight

(Gilder *v.* Merwin.)

months in the year, during which time there must be a suspension of all proceedings in court, and irreparable mischief may be done by injunctions issued and other proceedings instituted without the power to control them. The nature of the business of a Court of Equity is such as to require daily vigilance at the various stages of suits to prevent extreme injustice and oppression.

The jurisdiction, therefore, under the act of 1840, must be confined to bills for relief (and injunction, discovery, &c., as incidental thereto) in cases of actual fraud, accident, mistake and account. All the other branches to be found in the equity books, not vested by prior acts of assembly, remain ungranted.

Considering the relief prayed for under this head as within a liberal construction of the words accident and mistake, it is a decisive objection to the bill, that the plaintiff has a full, adequate and complete remedy at law, by application to the District Court in which the judgment was confessed, to open the judgment and let him into a defence on the merits. That court could not hesitate on motion, and making out a case entitled to relief, to order the judgment to be opened, and the defendant let into a defence. This is a jurisdiction which our courts of law have uniformly exercised as courts of law in numerous cases, and necessarily arises from the control they have over judgments entered in their own court by confession or otherwise; and on the hearing of such rule, they may either determine the case on depositions or order it to be tried by jury, with the benefit to the parties in the latter case of bills of exception to evidence on the charge of the court as fully as in other trials by jury. And if a discovery by the oath of a party is necessary in the District Court, it may be had in the same court.

That being the case, there is no reason why the party should be allowed to decline going before the proper legal tribunal, and receive aid from the equity powers of this court. It is not necessary to him, nor can he derive any peculiar benefits from it. The principles on which courts of equity proceed are in conformity with the doctrine. In regard to injunctions after a judgment at law, says Mr. Justice Story, (2 Com. on Eq. 179,) courts of equity will not relieve against a judgment at law, where the case in equity proceeds upon a ground equally available at law without any laches of the party. Nor will relief be granted by staying proceedings at law, if the party applying has been guilty of laches as to the matters of defence, or might by reasonable diligence have procured the requisite proofs. For when a verdict had been obtained at law against a defendant, and he neglected to apply for a new trial within the time appointed by the rules of court, a court of equity would not entertain a bill for an injunction upon the alleged ground that the original demand was unconscientious, or the subject-matter of an account, provided it was competent for the party to have laid those grounds before the jury on trial, or before the court of law on the motion for a new

(Gilder *v.* Merwin.)

trial. (Ib. 181.) And this kind of bill, which is called a bill for a new trial, is said to be watched by equity with extreme jealousy.

Nor can this court take jurisdiction on the ground of fraud, accident, or mistake, to relieve the surety from liability, where, as is alleged, he is discharged by time given to the principal. This does not fall within either of the heads of the jurisdiction I have mentioned; it is comprehended within the general injunction power of a court of equity as a means of prevention of fraud, which is not given to us. The relief, if proper, would also be given by the District Court if they saw fit to open the judgment, as all our courts of law apply this equity of the surety wherever a case comes before them in the ordinary course of their proceedings. The other grounds stated in the bill, of usury and of the necessity of exhausting the mortgaged premises first, are liable to the same remarks.

Injunction dissolved.